**-UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ISAAC KIM, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) ) |
| BARRICK GOLD CORPORATION, KELVIN P. M. DUSHNISKY, CATHERINE P. RAW, RICHARD WILLIAMS, and JORGE PALMES, | ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Isaac Kim ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Barrick Gold Corporation ("Barrick" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Barrick securities between February 16, 2017 and April 24, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Barrick is a gold mining company that purportedly engages in exploration and mine development. The Company also produces and sells gold and copper.

3.      Founded in 1983, the Company is headquartered in Toronto, Canada.  Barrick's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ABX."

4.      The Company has a history of pipe ruptures and chemical spills at its Valedero mine in the San Juan Province of Argentina. On September 13, 2015, the Company identified a valve failure on a leach pad pipeline, resulting in a release of cyanide-bearing process solution into a nearby waterway. This resulted in a temporary court order restricting the addition of new cyanide to the mine's processing circuit. The restriction was subsequently lifted, however, on September 24, 2015. Then, on September 8, 2016 a pipe carrying process solution was damaged by a large block of ice that had rolled down a nearby slope, resulting in a temporary suspension of operations at the Veladero mine. Operations resumed on October 4, 2016.

5.      On February 16, 2017, the Company held a conference call to discuss its 2016 fiscal year financial results. On the call, Defendant Palmes stated that "[a]t Veladero, 2016 was a very challenging year" do to the pipe-related damage, but that the Company "completed a series of remedial works to prevent such an incident from occurring again." On the same call,

Defendant Palmes provided fiscal year 2017 Veladero production guidance, stating: "For 2017, we expect increased production of 770,000 ounces to 830,000 ounces at all-in sustaining cost of $840 per ounce to $940 per ounce."

6.      On March 28, 2017, the Company's Veladero troubles reappeared, when a pipe carrying gold-bearing solution ruptured.

7.      Surprisingly, in response to the rupture, the Company reaffirmed its fiscal year 2017 guidance. On March 30, 2017, the Company stated: "[a]t this time, we do not anticipate a material impact to Veladero's 2017 production guidance."

8.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) that the pipes and safety systems at the Veladero mine were not robust enough to prevent gold-bearing solution spills; (ii) that, as a result, Argentinian authorities would restrict the addition of cyanide to the Veladero mine's heap leach facility and require remedial work; (iii) that these developments would impact (and were impacting) the production capacity of the Veladero mine; (iv) that as such, the Company's Veladero mine production guidance and total gold production guidance were overstated; and (v) as a result of the foregoing, Barrick's public statements were materially false and misleading at all relevant times.

9.      On April 24, 2017, the truth about the Veladero mine began to emerge when the Company issued a press release announcing its first quarter 2017 financial results. Therein, the Company revised its full year guidance, stating that "[f]ull-year gold production is now expected to be 5.3-5.6 million ounces, down from our previous range of 5.6-5.9 million ounces." The Company further stated that "[a]pproximately two-thirds of this reduction is attributable to the

anticipated sale of 50 percent of Veladero." The Company also provided Veladero-specific guidance, stating: "we now expect full-year production at Veladero of 630,000-730,000 ounces of gold, at a cost of sales of $740-$790 per ounce, and all-in sustaining costs of $890-$990 per ounce. . . . This compares to our original 2017 guidance of 770,000-830,000 ounces (100 percent basis), at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce."

10.    On this news, Barrick's share price fell $2.15, or 11.3%, to close at $16.89 on April 25, 2017.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

14.    Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, Barrick's stock trades under the NYSE, located within this District.

15.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff, as set forth in the attached Certification, acquired Barrick securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.    Defendant Barrick Gold Corporation is incorporated in Ontario, Canada. The Company's principal executive offices are located at Brookfield Place, TD Canada Trust Tower, Suite 3700, Toronto, Canada M5J 2S1.  Barrick's shares trade on the NYSE under the ticker symbol "ABX."

18.    Defendant Kelvin P. M. Dushnisky ("Dushnisky") has served at all relevant times as the Company's President and Director.

19.    Defendant Catherine P. Raw ("Raw") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since April 26, 2016.

20.    Defendant Richard Williams ("William") has served at all relevant times as the Company's Chief Operating Officer ("COO").

21.    Defendant Jorge Palmes ("Palmes") has served at all relevant times as the Company's Executive General Manager, responsible for overseeing the Veladero mine.

22.    Defendants Dushnisky, Raw, Williams, and Palmes (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Barrick's reports to the SEC, press releases and presentations to securities

analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

23.     Barrick is a gold mining company that purportedly engages in exploration and mine development. The Company also produces and sells gold and copper.

24.     The Company has a history of pipe ruptures and chemical spills at its Valedero mine in the San Juan Province of Argentina. On September 13, 2015, the Company identified a valve failure on a leach pad pipeline, resulting in a release of cyanide-bearing process solution into a nearby waterway. This resulted in a temporary court order restricting the addition of new cyanide to the mine's processing circuit. The restriction was subsequently lifted, however, on September 24, 2015. Then, on September 8, 2016 a pipe carrying process solution was damaged by a large block of ice that had rolled down a nearby slope, resulting in a temporary suspension of operations at the Veladero mine. Operations resumed on October 4, 2016.

**Materially False and Misleading Statements Issued During the Class Period**

25.    The Class Period begins on February 6, 2017, when the Company held a conference call to discuss its 2016 fiscal year financial results.  During the call, Defendant Palmes stated, in relevant part:

> At Veladero, 2016 was a very challenging year. In Q2, severe winter-related resulted in 42 days of lost production. In Q3, production was impacted by the two weeks suspension of an operation due to environmental incident quickly followed by a recovery action plan in Q4. ***We previously completed a series of remedial works to prevent such an incident from occurring again***, including the deployment of unmanned aerial vehicles for remote sensing.

(Emphasis added.)

26.    On the same call, Defendant Palmes provided fiscal year 2017 Veladero production guidance, stating: "For 2017, we expect increased production of 770,000 ounces to 830,000 ounces at all-in sustaining cost of $840 per ounce to $940 per ounce."

27.    On March 29, 2017, the Company issued a statement disclosing that on March 28, 2017, "the monitoring system at Veladero detected a rupture on a pipe carrying gold-bearing solution on the leach pad." The Company stated, in relevant part:

> Procedures were immediately activated to contain and mitigate the situation, and the Company quickly corrected the issue. At the same time, the Company shared this information with San Juan provincial authorities.
>
> All solution was contained within the operating facility.
>
> There was no impact to people or the environment.

28.    On March 30, 2017, the Company issued a press release entitled "Barrick Reports Restrictions at Veladero Mine Heap Leach Facility." Therein, the Company stated:

> Barrick Gold Corporation . . . today reported that the Government of San Juan province, Argentina, has temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility pending the verification that remedial works have been completed. The Company is working to complete this remediation as quickly as possible.

On the evening of March 28, the monitoring system at Veladero detected a rupture of a pipe carrying gold-bearing solution on the leach pad. All solution was contained within the operating site; no solution reached any diversion channels or watercourses. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29.

The safety of people and the environment remains Barrick's top priority. The incident did not pose any threat to the health of employees, communities, or the environment.

***At this time, we do not anticipate a material impact to Veladero's 2017 production guidance.***

(Emphasis added.)

29.    On April 6, 2017, the Company issed a press release entitled "Barrick Announces Strategic Cooperation Agreement with Shandong Gold." Therein, the Company laid out the details of the deal and discussed the its impact on the Veladero mine. In relevant part, the Company stated:

Barrick Gold Corporation . . . today announced that it has entered into a strategic cooperation agreement with Shandong Gold Group Co., Ltd. ("Shandong"), the leading underground mining company in China, based in Jinan, Shandong province.

As a first step in the new partnership, ***Shandong Gold Mining Co., Ltd, the listed company of Shandong Gold Group, will acquire 50 percent of Barrick's Veladero mine in San Juan province, Argentina, for $960 million***. As a second step, Barrick and Shandong will form a working group to explore the joint development of the Pascua-Lama deposit. As a third step, both companies will evaluate additional investment opportunities on the highly prospective El Indio Gold Belt on the border of Argentina and Chile, which hosts a cluster of worldclass gold mines and projects including Veladero, Pascua-Lama, and Alturas.

"Our ambition is to make Barrick a leading twenty-first-century company in any industry in any jurisdiction, and by definition, that means creating a distinctive, enduring, and trust-based relationship with China and China's best companies. This agreement moves us down that path. Shandong is an ideal partner to help us unlock the untapped mineral wealth of the El Indio Belt over the long-term, while working with us to generate more value from the Veladero mine today," said Barrick Executive Chairman John L. Thornton. "We look forward to working in partnership with Shandong, sharing mining and development expertise, talent, and

capital in ways that will create added value for our respective owners, and our government and community partners in San Juan province."

"Our goal is to build a long-term relationship with Barrick, and this agreement encapsulates exactly what we wanted to achieve," said Shandong Chairman Chen Yumin. "In this global economy, it is more important than ever to find international partners with a common vision for developing mines and generating prosperity in an environmentally and socially responsible manner. We are excited to enter Argentina's dynamic mining industry in partnership with Barrick at Veladero, while exploring other opportunities in one of the most prospective mineral districts in the world."

Upon completion of the transaction, the Veladero mine will be overseen by a Joint Venture Board consisting of three nominees appointed by each company. In order to ensure continuity of operations, both companies intend to maintain the mine's current management team following closing of the transaction.

Proceeds from the transaction will be used to reduce debt and for investments in our business to grow free cash flow per share.

***The transaction is expected to close at the end of the second quarter of 2017, and is subject to regulatory and other approvals, including Shandong Gold Mining Co., Ltd shareholder approval, and other customary closing conditions.***

Shandong Gold Group Co. Ltd., the direct and indirect holder of 56 percent of the outstanding shares in Shandong Gold, has irrevocably agreed to vote in favor of the proposed transaction.

The transaction has received approvals from China's National Development and Reform Commission (NDRC), and the State-owned Assets Supervision and Administration Commission (SASAC) of Shandong Province. Applications for approval by other Chinese regulatory authorities, including MOFCOM (Ministry of Commerce) and SAFE (State Administration of Foreign Exchange), are underway.

Shandong has financing commitments in place for the full value of the transaction.

**Details of the Strategic Cooperation Agreement**

The Strategic Cooperation Agreement with Shandong is consistent with Barrick's strategy to develop partnerships of depth with the potential to create long-term value for the Company's owners, as well as our community and government partners.

Barrick and Shandong began to develop such a partnership in April of 2016 with a meeting between the two companies' chairmen. In the year since, we have engaged extensively to understand each other's respective values, strategic

priorities, and operating capabilities. Senior management and cross-functional teams have participated in multiple joint site visits to Barrick and Shandong operations in Argentina, Canada, and China. Given both companies' commitment to innovation in mining, we have established a channel to share ideas on using technology and digitization to achieve step changes in efficiency, safety, and environmental stewardship. Barrick's team is led by Chief Innovation Officer Michelle Ash. Shandong's team is led by Deputy General Manager for Technology Cui Lun.

Under the Agreement, Barrick and Shandong will leverage their respective strengths to optimize and enhance the value of the Veladero mine, in line with step one of the partnership. As step two, Shandong will work with Barrick to explore the potential of investing in and jointly developing the Pascua-Lama deposit. To advance this, Shandong will embed a team of underground mining engineers and project development specialists with Barrick's Pascua-Lama project team.

As step three, the companies have also agreed to work together to explore additional investment and development opportunities on the El Indio Belt, including the Alturas project, in addition to other global opportunities.

Complementing Barrick's operating experience and expertise in the region, Shandong will provide access to substantial internal engineering, construction, and mining expertise, with a particular focus on underground mining, as well as access to capital and equipment.

CIBC World Markets Inc. is acting as financial advisor to Barrick. Davies Ward Phillips & Vineberg LLP is acting as legal counsel to Barrick.

**About the Veladero mine**

The Veladero mine is located in the San Juan province of Argentina, on the highly prospective El Indo Belt, approximately 10 kilometers away from Barrick's Pascua-Lama project. Veladero is located at elevations of between 4,000-4,850 meters above sea level, approximately 375 kilometers northwest of the city of San Juan. As of December 31, 2016, the mine had proven and probable gold reserves of 6.7 million ounces, and measured and indicated gold resources of 3.3 million ounces. ***The mine is expected to produce 770,000-830,000 ounces of gold in 2017, at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce.***

(Emphasis added.)

30.    On April 21, 2017, *Reuters* reported that Barrick and Shandong presented a $500 million plan on to make safety and environmental improvements to the Veladero gold mine. In the report, Defendant Williams is quoted stating "[w]e've got a plan over two years to invest half

a billion dollars to develop Veladero operations" and "[t]he leach pad is going to be extended and developed and improved. So it's going to be re-engineered."

31.    The statements referenced in ¶¶ 25-30 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) that the pipes and safety systems at the Veladero mine were not robust enough to prevent gold-bearing solution spills; (ii) that, as a result, Argentinian authorities would restrict the addition of cyanide to the Veladero mine's heap leach facility and require remedial work; (iii) that these developments would impact (and were impacting) the production capacity of the Veladero mine; (iv) that as such, the Company's Veladero mine production guidance and total gold production guidance were overstated; and (v) as a result of the foregoing, Barrick's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

32.    On April 24, 2017, the truth about the Veladero mine began to emerge when the Company issued a press release announcing its first quarter 2017 financial results. Therein, the Company stated, in relevant part:

- Full-year gold production is now expected to be 5.3-5.6 million ounces, down from our previous range of 5.6-5.9 million ounces. Approximately two-thirds of this reduction is attributable to the anticipated sale of 50 percent of Veladero. Cost of sales and all-in sustaining cost guidance for the full year remains unchanged.

- A comprehensive plan to strengthen and improve the Veladero mine's operating systems is now under review by federal and provincial authorities in Argentina. Our adjusted guidance assumes normal leaching activities will resume in June, pending government approval and the lifting of judicial restrictions.

\*\*\*

11

We now expect full-year gold production of 5.3-5.6 million ounces, down from our previous range of 5.6-5.9 million ounces. A significant portion of this reduction is attributable to the anticipated sale of 50 percent of Veladero, which is expected to close at the end of the second quarter. Our updated guidance assumes no change to Acacia's full-year guidance as a result of the export ban on concentrates currently affecting Acacia's operations in Tanzania. It also assumes the resumption of normal processing activities at Veladero in June, subject to government approval of proposed modifications to the mine's operating systems…

*** 

**Veladero Update**

On March 28, a coupling on a pipe carrying gold-bearing solution at the Veladero mine heap leach facility failed. Solution released from the rupture was contained within the operating site and did not result in any impact to the environment or people. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29. On March 30, the Government of San Juan province temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility, pending the completion of works to strengthen and improve the mine's operating systems.

Barrick presented its proposed work plan to San Juan provincial authorities on April 21, following extensive consultation with both federal and provincial officials and regulators. The provincial government has indicated it will take approximately two weeks to review the Company's proposals, a process that will also include federal authorities, including the national Ministry of Environment and Sustainable Development. Initial work on the proposed modifications to the heap leach facility has already begun, concurrent with the review by provincial and federal authorities. Our updated guidance assumes a resumption of normal leaching activities at the mine in June, subject to approval by the Government of San Juan province, the lifting of operating restrictions by the San Juan provincial court, and the resolution of regulatory and legal matters by the federal and provincial courts (for more information about these matters, please see Note 17 "Contingencies" of Barrick's first quarter financial statements and the notes thereto). This assumption is based on our assessment of the time required to complete the proposed modifications to the leach pad. The timing of approval for the resumption of leaching activities will depend on the actual progress of work, any potential new requirements, and a final evaluation of the completed modifications by provincial authorities. In parallel with the submission of a new technical plan for the operation, Barrick has also presented an updated community investment and engagement plan to the Government of San Juan and federal authorities for review.

***On a 100 percent basis, we now expect full-year production at Veladero of 630,000-730,000 ounces of gold, at a cost of sales of $740-$790 per ounce, and***

***all-in sustaining costs of $890-$990 per ounce.*** Barrick's share of full-year production, assuming 50 percent ownership from July 1, is expected to be 430,000-480,000 ounces of gold. This compares to our original 2017 guidance of 770,000-830,000 ounces (100 percent basis), at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce.

(Emphasis added.)

33.     On this news, Barrick's share price fell $2.15, or 11.3%, to close at $16.89 on April 25, 2017.

34.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Barrick securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barrick securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Barrick or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Barrick;

- whether the Individual Defendants caused Barrick to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Barrick securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Barrick securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Barrick securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

44.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Barrick securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Barrick securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Barrick securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Barrick's finances and business prospects.

48.    By virtue of their positions at Barrick, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Barrick, the Individual Defendants had knowledge of the details of Barrick's internal affairs.

50.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Barrick.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Barrick's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

17

the market price of Barrick securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Barrick's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Barrick securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

51.    During the Class Period, Barrick securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Barrick securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Barrick securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Barrick securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of Barrick, and conducted and participated, directly and indirectly, in the conduct of Barrick's business affairs.  Because of their senior positions, they knew the adverse non-public information about Barrick's misstatement of income and expenses and false financial statements.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Barrick's financial condition and results of operations, and to correct promptly any public statements issued by Barrick which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Barrick disseminated in the marketplace during the Class Period concerning Barrick's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Barrick to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Barrick within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Barrick securities.

58.     Each of the Individual Defendants, therefore, acted as a controlling person of Barrick.  By reason of their senior management positions and/or being directors of Barrick, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Barrick to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Barrick and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Barrick.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: May 19, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***